

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF:BT
F. #2024R00832

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 19, 2024

By ECF

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201

      Re:   United States v. Dewitt John
             Case No. 24-MJ-620

Dear Judge Bloom:

      The government respectfully submits this letter in support of its application for the entry of an order of detention as to the defendant Dewitt John (the "defendant"). The defendant is charged by complaint (the "complaint") with the production of child pornography[1] (also commonly known, and referred to herein, as "child sexual abuse material") in violation of Title 18, United States Code, Section 2251(a). Because this charge carries a presumption of detention, and the defendant is both a danger to the community and a risk of flight, an order of detention should be entered.

## BACKGROUND

### I. Offense Conduct

      The defendant is 31 years old and has a history of violent and abusive criminal misconduct toward minor girls. In this case, he used the internet to groom two 13-year-old girls,

---

[1] The term "child pornography" is defined as set forth in 18 U.S.C. § 2256(8), which, in pertinent part, states that "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct. . . ." 18 U.S.C. § 2256(8); see also Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002) (analyzing constitutional validity of the definitions set forth in 18 U.S.C. § 2256(8)).

Jane Doe 1 and Jane Doe 2, whom he repeatedly paid to send him sexually explicit images and videos of themselves.

The defendant began grooming Jane Doe 1 in March 2024. He sought her out in a Reddit forum for teenagers called "Am I ugly/teens," where Jane Doe 1 recalled that she posted images of herself that said she was 13. After responding to one of Jane Doe 1's Reddit posts and offering to pay her for sexually explicit images of herself, the defendant started communicating with Jane Doe 1 on Instagram and iMessage. Amid asking about Jane Doe 1's interests and family life,[2] the defendant continued to solicit her for sexually explicit content.

On March 28, 2024, once the defendant had received at least one video of Jane Doe 1 engaging in sexual conduct, the defendant began asking Jane Doe 1 for increasingly graphic sexual content. He gave Jane Doe 1 detailed instructions on how to produce such content, which included instructing her to make a "POV video of you riding something, front facing camera. Tell daddy how much you want him to fuck you." After giving these instructions, the defendant sent Jane Doe 1 $20 on Cash App.[3]

On March 31, 2024, the defendant received another video of Jane Doe 1 engaging in sexual conduct. Upon receiving this video, the defendant admonished her that "[w]hen i said riding i meant like a makeshift dildo . . . . [s]omething like that" and continued to request more sexually explicit content. Despite Jane Doe 1's protests—in which she told the defendant she was "scared," not "comfortable with that," and "only 13"—the defendant was not deterred. He continued to request the content, stating, among other things, "Oh. Thought you were older. You've never tried anything. Does not have to be anything big." He also suggested that Jane Doe 1 use "[a] marker" to produce the video. That night, the defendant received two more videos of Jane Doe 1 engaging in sexual conduct.

The defendant mirrored these interactions with Jane Doe 2. On April 12, 2024, Jane Doe 1 messaged the defendant that one of her friends, Jane Doe 2, was also willing to send him sexually explicit images and videos in exchange for money. From at least April 13 to April 18, 2024—after asking Jane Doe 2 whether she was "13 as well"—the defendant also paid Jane Doe 2, via Cash App, for several sexually explicit images of herself.

The government understands that the defendant has persistently reached out to Jane Doe 1 on the internet until approximately October 2024, despite that she has not responded to his messages since approximately April 2024.

---

[2] Among other topics, the defendant asked what Jane Doe 1's parents did for a living, noting that it was "[w]ay to early for [Jane Doe 1] to decide" on her own career. He also asked about her daily activities, which she told him included "ma[king] the soccer team" recently and "playing outside" with her friends and siblings, one of whom, she told the defendant, was nine years old.

[3] Cash App is an online payment service that allows users to send and receive money.

## II.     The Defendant's Criminal History

The defendant has a history of threatening and attempting violence against young women whom he met online.

In or about September 2014, the defendant was sentenced to approximately a year in prison in Sweden for the attempted kidnapping of a 17-year-old girl. Swedish authorities alleged that, after meeting the minor girl twice in person, the defendant became enraged when she refused further contact with him. In April 2014, the defendant traveled to the Stockholm area where the girl lived and bought an army knife, rope, and cable ties. He then went to the girl's home and forced himself inside with a car tool. The girl's father was in the house and forced the defendant to leave. The defendant was subsequently arrested by Swedish police, who confiscated an army knife, cable ties, and an empty gun holster from him. Swedish authorities uncovered that, during the defendant's online communications with the girl, he told her that he had a gun under his bed at his home in Brooklyn, New York. They also found evidence on the defendant's cell phone that he had searched the internet about the penalty for murder in Sweden.

In April 2023, a woman reported to a local Virginia police department that the defendant has repeatedly sent her violent threats and harassing messages since at least approximately 2021. The woman told police that she met the defendant online when she was approximately 18 years old, and that he began sending her harassing and threatening messages after she did not reciprocate his romantic interests. Among other things, the woman, who gave police several screenshots and images of the defendant's messages, reported that the defendant told her:

- September 2021: "You all ought to know your place. You're nothing, should all be raped to be put in your place. That's what you need. Hope you get to experience that to show your worth. Taliban has the right idea in putting where you belong. You deserve it and everything that happens to you. Worthless shit."

- March 2022: "Well i aint no beta bitch lover boy no mo, nor do I associate with any other beta cucks. the only bitch here is you where things belong. Man on top women below. As how the lord intended it . . . . You represent all the years I've had to deal with people like you. All this pent up resentment I hold on to. Finally someone's going to take the consequences . . . . Nuke 1 on its way. You wont personally hear from me again. You may see me but you wont hear from me again. Remember im crazy just like putin. Save the biggest nuke for last."

- December 2022: "I'm going to murder your family. I Could have went a different path but you're too much of a righteous cunt to take my offer. So that be it."

In February 2024, the woman reported to police that she was sent screenshots from an online conversation between the defendant and someone else in which the defendant said, among other things, "I plan on visiting [the woman] before I die," and "Well. Murder suicide it is."

3

       The government understands from a police report dated June 5, 2024 that the woman's allegations about the defendant's violent threats resulted in two warrants for the defendant's arrest in Virginia.

## DISCUSSION

### I. Applicable Law

       Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon determining that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A rebuttable presumption of dangerousness and risk of flight arises where, as here, a defendant is charged with a violation of 18 U.S.C. § 2251 (sexual exploitation of children). 18 U.S.C. § 3142(e)(3)(E). This means that the Court must presume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id.

       To rebut this statutory presumption, the defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). If the defendant satisfies this burden of production, the government must meet the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and/or by a preponderance of evidence that the defendant presents a risk of flight. Id. The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

       Four factors guide the Court's determination of whether the presumptions of dangerousness and flight are rebutted:

    (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";

    (2) "the weight of the evidence against the person";

    (3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

    (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).  In weighing the evidence presented, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."[4]  <u>Mercedes</u>, 254 F.3d at 436.

## II.     The Court Should Enter a Permanent Order of Detention

Each of the above factors weighs heavily in favor of a determination that the defendant is both a danger to the community and a risk of flight.

### A. The Defendant Poses a Danger to the Community

First, the conduct with which the defendant is charged is very serious.  The defendant intentionally used the internet to prey upon and sexually abuse two vulnerable young girls.  Knowing Jane Doe 1 and Jane Doe 2 were just 13 years old, the defendant groomed them to enable his sexual exploitation.  He then repeatedly solicited and paid them for sexually explicit images and videos, taking advantage of their youth, inexperience, and financial dependence.  With respect to Jane Doe 1, the defendant received at least four videos of her engaging in sexual conduct.  His requests to Jane Doe 1 became increasingly graphic, culminating in the defendant's detailed instructions to her on how to produce videos that she told him made her afraid, including because she was "only 13."  Despite this, the defendant was not deterred—he disregarded her protests and continued to make his instructions and requests, ultimately receiving more sexually explicit content from her.  Moreover, the defendant's similarly exploitative behavior towards Jane Doe 2 shows that his abuse against Jane Doe 1 was not an isolated incident.

Second, the weight of the evidence against the defendant is substantial.  In addition to the expected testimonies of Jane Doe 1 and Jane Doe 2, the government's evidence consists of, among other things, (i) an extraction of Jane Doe 1's cell phone, which contains electronic communications between the defendant and Jane Doe 1 in which Jane Doe 1 sent him sexually explicit images and videos, including videos of herself engaging in sexual conduct, (ii) judicially-authorized search warrant returns of the defendant's Instagram account, which contain similar electronic communications between the defendant and Jane Does 1 and 2, including additional videos of Jane Doe 1 engaging in sexual conduct and sexually explicit images of Jane Doe 2, and (iii) subpoena returns for a variety of accounts that the defendant has used to communicate with and pay Jane Does 1 and 2, including his Cash App account, which collectively identify the defendant as the user of these accounts.

Third, the defendant has history of attempting and threatening violence against young women, including at least one minor girl that he attempted to violently kidnap after she

---

[4] Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means.  <u>See</u> 18 U.S.C. § 3142(f)(2); <u>see also</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000).  In the pre-trial context, few detention hearings involve live testimony or cross-examination; most proceed on proffers.  <u>Id.</u> at 131.  This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery."  <u>Id.</u> (internal quotation marks omitted).  Indeed, the Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness.  <u>See, e.g.</u>, <u>Mercedes</u>, 254 F.3d at 437.

stopped contact with him. The government submits that there is a strong risk that the defendant could attempt the same violence against Jane Does 1 and 2, especially since the government understands that the defendant has continued to reach out to Jane Doe 1 despite her lack of contact with him. Moreover, under the law, the Court must consider the defendant's dangerousness not only to the Jane Does 1 and 2, but to the community, including other potential victims. The defendant's repeated abuse of young women and minor girls, including through coercive and threatening means, emphasizes the nature and seriousness of the danger to any member of the community, including other women and minor children. For these reasons, the history and characteristics of the defendant show that he poses a danger to the community, and weigh in favor of detention.

### B. The Defendant Poses a Risk of Flight

In addition to the clear danger posed if the defendant were to be released, the defendant poses a significant risk of flight. For the first time, the defendant—who the government believes is a dual citizen of St. Vincent and the Grenadines—is facing federal criminal charges in the U.S. And for his charged conduct, the defendant is facing a mandatory minimum sentence of 15 years, which provides a substantial incentive to flee. See 18 U.S.C. 2251(e). When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure his appearance. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (summary order) ("[T]he presumption regarding flight risk has changed because Becton now faces a ten-year mandatory minimum sentence.").

### CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/ Brooke Theodora
Brooke Theodora
Assistant U.S. Attorney
(718) 254-6342

cc: Clerk of the Court (LB) (by email)
Counsel of record (by email)